IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

WALATHAN "WALLY" HENDERSON                                    PLAINTIFF

v.                        CASE NO.  4:16-CV-00111 BSM

ARKANSAS DEPARTMENT
OF HUMAN SERVICES                                             DEFENDANT

<u>ORDER</u>

Defendant Arkansas Department of Human Services's ("ADHS") motion for summary

judgment [Doc. No. 12] is granted.

I.  BACKGROUND

Plaintiff Walathan Henderson is a black man who brings this lawsuit alleging that

defendant ADHS hired Shannon Halijan, a white woman, as the division manager for adult

protective services ("APS"), instead of promoting him due to his race and sex.  Complaint

¶¶ 35, 36, Doc. No. 1.  APS is a unit of the division of aging and adult services ("DAAS").

The mission of DAAS is to promote the health, safety, and independence of older Arkansans

and adults with physical disabilities.  Pl.'s Resp. to Def.'s Statement of Undisputed F.

("Facts") ¶ 5, Doc. No. 19.  APS investigates the abuse, neglect, and exploitation of senior

citizens and impaired or endangered individuals aged eighteen and older.  *Id.*

Henderson worked for United Parcel Service for thirty-seven years prior to working

for ADHS.  He spent thirty of those years in management and he has a bachelor's degree in

business management.

Henderson began working as an area manager for APS in February 2010 and was

responsible for the eastern half of Arkansas.  Henderson Dep. 20:1, Doc. No. 20-1.  He was initially supervised by division manager Carolyn Singleton, but after three years, Doug Walker became his supervisor and division manager.  Henderson Dep. 44:11–16, Doc. No. 19-1.    Henderson supervised two field managers, who each supervised ten to twelve investigators.  Henderson Dep. 20:16–20, Doc. No. 20-1.  Henderson was responsible for managing employees that  screened calls reporting abuse and for training staff on state laws governing APS investigations.  Facts ¶¶ 6, 23.

Assistant director Brad Nye informed Henderson in May 2015, that the division manager, Doug Walker, was no longer working for ADHS.  Facts ¶ 9; Doc. No. 20, at 6.  Although Henderson had served as Walker's back-up for two and a half years, Nye discouraged Henderson from applying for the division manager position.  Henderson Dep. 49:4, Doc. No. 20-1.  When Henderson expressed disbelief at Nye's discouraging words, Nye countered, "Oh, you can apply if you want to, but we already have somebody in mind."  Henderson Dep. 49:9, Doc. No. 20-1.  Henderson therefore did not apply for the position.

Approximately one week later, Carolyn Singleton came in to serve as the division manager until the position could be filled.  Shannon Halijan arrived about one week after Singleton and trained alongside Singleton to prepare for accepting the job.  Henderson Dep. 51:10, Doc. No. 20-1.  Halijan trained for about three weeks until the position was posted.  Henderson Dep. 52:12, Doc. No. 20-1.  The position was posted online as an "attorney specialist."  Doc. No. 20-2, at 14.  ADHS interviewed eight applicants who met the minimum qualifications for the position, Bryant Aff. ¶ 3, Doc. No. 12-2; Facts ¶ 20, but ultimately

2

hired Halijan.

Henderson filed a charge of discrimination with the Equal Employment Opportunity Commission claiming race, sex, age, and disability discrimination, and he timely filed this lawsuit for race and sex discrimination.  ADHS moves for summary judgment.

## II.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249–50 (1986).  Once the moving party demonstrates that there is no genuine dispute of material fact, the non-moving party may not rest upon the mere allegations or denials in his pleadings.  *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011).  Instead, the non-moving party must produce admissible evidence demonstrating a genuine factual dispute requiring a trial.  *Id.*

"If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e)(2).  All reasonable inferences must be drawn in a light most favorable to the nonmoving party, *Holland v. Sam's Club*, 487 F.3d 641, 643 (8th Cir. 2007), but a plaintiff's own self-serving, conclusory allegations in an affidavit or deposition, standing alone, are insufficient to defeat summary judgment.  *Haas v. Kelly Services*, 409 F.3d 1030, 1034 (8th Cir. 2005).  Finally, the evidence is not weighed, and no credibility determinations are made.  *Jenkins v. Winter*, 540 F.3d 742, 750 (8th Cir. 2008).

3

### III.  DISCUSSION

A.     Sovereign Immunity

States, state agencies, and state officials acting in their official capacities are immune from federal lawsuits.  *Monroe v. Arkansas State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007); *Buckley v. Univ. of Arkansas Bd. of Trustees*, 780 F. Supp. 2d 827, 829 (E.D. Ark. 2011). There are, however, three exceptions: (a) when a state waives immunity by consenting to suit; (b) when Congress abrogates the state's immunity through a valid exercise of its powers; and (c) when a plaintiff seeks prospective, equitable relief for ongoing violations of federal law (*Ex Parte Young* doctrine).  *Buckley*, 780 F. Supp. at 829; *see Burk v. Beene*, 948 F.2d 489, 493 (8th Cir. 1991).  The state of Arkansas has not waived sovereign immunity, *Burke*, 948 F.2d at 493–94, so ADHS is immune from suit unless Henderson can meet the second or third exception.

Congress did not abrogate sovereign immunity when it enacted section 1983.  *Id.*  The Eleventh Amendment does not preclude state officials from being sued in their official capacities for prospective injunctive relief, but this doctrine does not extend to states or state agencies. *Monroe*, 495 F.3d at 594.  Accordingly, Henderson cannot sue ADHS for any type of relief, injunctive or otherwise, under section 1983, and summary judgment is granted on Henderson's section 1983 claims.

Congress did, however, abrogate sovereign immunity when it enacted Title VII. *Okruhlik v. Univ. of Arkansas ex rel. May*, 255 F.3d 615, 622 (8th Cir. 2001) (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 452 (1976)).  Henderson's Title VII claims are therefore

4

addressed on the merits.

      B.    <u>Race Discrimination</u>

Henderson provides no direct evidence of discrimination.   To establish a prima facie case for race discrimination, Henderson must show that (1) he is in a protected class, (2) he was qualified for and applied for an open position, (3) he was denied that position, and (4) ADHS filled the position with a person outside his racial class.  *Fields v. Shelter Mutual Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008).  The burden of establishing a prima facie case is not onerous.  *Grant v. City of Blytheville, Arkansas*, 841 F.3d 767, 773 (8th Cir. 2016).

The first and fourth elements of Henderson's prima facie case are satisfied because Henderson is black, and ADHS filled the position with a white person.  Normally, Henderson would not be able to meet the second and third elements of his prima facie case because the position, as formally posted, required a law degree, which Henderson did not have, and because Henderson did not apply for the position.   Henderson, however, claims the requirement of a law degree was pretext and that ADHS revised the division manager position to require a law degree to prevent him from applying because of his race.  He asserts his failure to apply should not preclude him from establishing his prima facie case because the law excuses the failure if applying would have been futile.  *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365–67 (1977).

"[A]n employee who does not formally apply must make every reasonable attempt to convey his interest in the job to the employer before he may prevail on a discrimination claim." *E.E.O.C. v. Audrain Health Care, Inc.*, 756 F.3d 1083, 1087 (8th Cir. 2014) (internal

punctuation omitted).  Henderson argues that he asked Brad Nye, an assistant director of DAAS, if he could apply for the division manager position, but that Nye discouraged him. Doc. No. 20, at 6; Henderson Dep. 49:9–10, Doc. No. 20-1.  When the division manager position was posted online, it required a law degree.  Because Henderson did not have a law degree, it was not unreasonable that he did not formally apply.

Furthermore, it appears that Henderson would have qualified for a promotion to division manager but for the change requiring a law degree.  Henderson submitted two performance evaluations, one completed by Doug Walker, the previous division manager, Doc. No. 19-2, at 5, and another completed by Brad Nye.  *Id.* at 11.  Both indicate that Henderson was an "exceptional" employee and that he was eligible for a merit increase.  *Id.* at 9, 13.  Walker, the previous division manager, also believed Henderson was qualified for the division manager position.  Walker Aff. ¶ 22, Doc. No. 19-2.  Assuming, without deciding, that Henderson has established a prima facie case, the burden shifts to ADHS to articulate a legitimate, nondiscriminatory reason for rejecting Henderson.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Again, this  burden is not an onerous one.  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011) ("The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence.").

Brian Bowen, an assistant director of DAAS, explains that the division manager position was revised to require a law degree because APS was suffering from a significant array of problems that compromised its ability to carry out its duties.  Bowen Aff. ¶ 4, Doc.

6

No. 12-1.  He asserts that the staff was not properly trained regarding the screening, investigation, and processing of reports of maltreatment and that fewer than 32% of complaints were being investigated annually.  *Id.* (citing to Adult Protective Services Complaints Received Statistics Statewide Year: 2014, Doc. No. 12-1, at 8–10).  One of the overlooked complaints involved the sexual abuse of a developmentally disabled female resulting in pregnancy.  *Id.* ¶ 4; Facts ¶ 6.  Bowen also asserts that APS workers were unprepared for court, exhibited unprofessional attitudes, and refused to cooperate with federal agents conducting investigations into Medicaid and Social Security fraud.  Bowen Aff. ¶ 6.  Bowen says APS was losing credibility with law enforcement and other stakeholders.  *Id.* ¶ 5.

Bowen felt that APS would benefit from new leadership after one area manager was terminated and the division manager resigned.  *Id.* ¶ 7.  He wanted the new division manager to understand privacy laws and to know how to conduct investigations, write legal documents and letters, interpret and understand various legal actions, and evaluate evidence according to applicable legal standards.  *Id.* ¶¶ 7, 9.  Bowen believed a lawyer's critical thinking skills and ability to interpret statutory standards would be advantageous given the challenges faced by the division manager.  *Id.* ¶ 8.  He also believed a law degree and familiarity with the court system would be assets because all APS custody cases go through the state circuit court, and cases that are appealed by offenders go through the administrative law process.  *Id.* ¶ 8.  Finally, Bowen claims he felt a lawyer would be more capable of restoring the damaged relationships with law enforcement, the legislature, judges, lawyers, and health care

providers. *Id.* ¶ 8; Facts ¶ 10.  Brad Nye agreed with this assessment.  Nye Aff. ¶ 3, Doc. No.

12-3.  Accordingly, DAAS requested an increased paygrade to attract a properly qualified

individual with a legal background to fill the position.  Doc. No. 20-2, 11 ("Position

Crossgrade/Downgrade Request ZPAOS1").

Although Henderson generally disputes whether a lawyer was needed for the division

manager position, it is undisputed that; (1) Bowen was familiar with the quality of Halijan's

work from past experience working with her at a private firm; (2) Halijan was a lawyer with

experience in adult guardianship cases and probate proceedings, ADHS Division of Children

and Family Services ("DCFS") dependency-neglect hearings and appeals, and administrative

law proceedings; (3) Halijan helped draft a custody bill and testified before the legislature;

and (4) Halijan had experience conducting securities fraud investigations, which Bowen felt

would be helpful in pursuing rising numbers of financial exploitation cases.  Bowen Aff. ¶

8; Facts ¶¶ 10, 13.

The reasons provided by ADHS satisfy its burden of stating legitimate,

nondiscriminatory reasons for preferring Halijan over Henderson.  *See Lidge-Myrtil v. Deere*

*& Co.*, 49 F.3d 1308, 1312 (8th Cir. 1995) ("We do not sit to determine if this reason is based

on sound principles of business judgment.").  The burden, therefore, shifts back to Henderson

to show that the reasons given by ADHS are pretext for discrimination.  *McDonnell Douglas*

*Corp.*, 411 U.S. at 804.  Henderson may demonstrate pretext either by showing ADHS's

explanation has no basis in fact or by showing that ADHS was more likely motivated by a

discriminatory purpose.  *Cox v. First Nat'l Bank*, 792 F.3d 936, 939 (8th Cir. 2015).  "Proof

of pretext, coupled with a strong prima facie case, may suffice to create a triable question of fact. *Torgerson*, 643 F.3d at 1046. Henderson's burden to show pretext merges with his ultimate burden to show that he was the victim of discrimination. *Id.*

Henderson relies on three broad categories of evidence to establish pretext: (1) the lack of need for a lawyer to fill the division manager position, (2) his qualifications compared to Halijan's, and (3) ADHS's race-biased culture. The first two aim to demonstrate that ADHS's stated reasons have no basis in fact; the last suggests a discriminatory motive. *See Cox*, 792 F.3d at 939.

First, Henderson asserts that a lawyer was not needed to serve in the role of division manager. In support of this and in contrast to ADHS's claim that it sought new leadership to address problems with training and professionalism, to repair relationships, and to better navigate the court system, Henderson states there "were no significant problems that APS was experiencing at the time" and that the "problems were made-up." Facts ¶¶ 11, 23. Walker further asserts that APS staff was properly trained because the staff was required to go through "a rigorous introductory training program." Walker Dep. ¶ 11 ("Mr. Bowen and Mr. Nye contend that the staff of Adult Protective Services were poorly trained, which is not true.").

These broad, conclusory denials do not address ADHS's evidence that investigations were down to less than 32%. Facts ¶ 6 (citing to Adult Protective Services Complaints Received Statistics Statewide Year: 2014, Doc. No. 12-1, at 8–10). Although the inference provided by ADHS is that the drop in investigations is negative, the record does not clearly

9

show what caused the drop in investigations or what the implications are.

The performance evaluations submitted by Henderson also show that APS had some problems. One of Henderson's evaluations states, "The Southeast region has required some direct guidance as a result of field management's lack of oversight and guidance, as well as adherence to policy." Doc. No. 19-2, at 7. One of Walker's evaluations evidences "difficult personnel issues that have included some set-backs." Doc. No. 19-3, at 14. The evaluations identify "historically lacking" areas in which more training is needed, "including engaging state and national stakeholders on issues related to investigation of abuse and neglect of adults with intellectual disabilities." Doc. No. 19-3, at 15.

In addition to demonstrating that APS was experiencing problems generally, the evidence submitted by Henderson supports ADHS's reasons for specifically wanting a lawyer. It shows that privacy issues and financial exploitation were salient legal concerns. Doc. No. 19-3, at 15, 25, 26; Henderson Dep. 38:16, Doc. No. 19-1. It shows that a law degree and legal experience could legitimately be viewed as assets. Doc. No. 19-3, at 26 ("He has been Division lead concerning matters related to Department-wide registry consolidation in response to legislation."); Henderson Dep. 21:1–2, Doc. No. 20-1 (part of his job was to make sure staff was prepared for court); Facts, ¶¶ 7, 23 (part of his job was to "[train] the staff on state laws [that govern the investigative process] for the entire state"); Henderson Dep. 37:21, Doc. No. 20-1 (acknowledging that ADHS, at times, has to obtain an order to investigate from a judge in order to deal with difficult clients); Henderson Aff. ¶ 8 ("If a call did not meet the statutory criteria for abuse, neglect, or exploitation," then the

staff was charged with the duty of screening the calls.); OPM Hiring Freeze Exception Request, Doc. No. 20-2, at 12 ("This position is responsible for ensuring the staff execute duties in accordance with state statute and frequently interfaces with the Governor's offices and State Legislators."). Various emails submitted by Henderson further show that the division manager engaged in communications with various senators, participated in legislative sessions, and had the duty to represent the interests of DAAS before legislators. Doc. No. 19-3, at 30–33. Thus, Halijan's experience with legislative drafting was a legitimate asset.

In support of his position that the responsibilities of the division manager position did not require a lawyer, Henderson points out that no previous division manger had been lawyer. He further states that he observed Halijan, and that she performed the same duties as the previous division managers, and that when Halijan was trained for the position, she was not trained by a lawyer. Moreover, she signs documents as "Division Manager." Facts ¶¶ 9, 13, 25. Henderson argues that, when ADHS posted the position, it described its purpose as to "fill the role of program manager for Adult Protective Services." Doc. No. 19-3, at 6. Henderson argues that the Office of Chief Counsel is a division of lawyers "that handles most of the legal needs" of the ADHS and that "Halijan performs no significant legal duties." Facts ¶ 25. He points out that the Office of Chief Counsel has lawyers available for the various agencies within ADHS, and when APS staff needs legal guidance, they seek it from the Office of Chief Counsel. Walker Aff. ¶¶ 12, 15, 20, 21.

Henderson's arguments are well taken but not persuasive. Characterizing the issue

11

as whether a lawyer was "needed" misses the point.  ADHS does not dispute that Halijan was hired as the division manager or that she fulfills the duties of the division manager as an "attorney specialist."   ADHS simply decided that hiring a lawyer to serve as division manager would be beneficial.  George Bryant, the ADHS human resources administrator, explains that "[a]n Attorney Specialist position is used to fill various positions within DHS and not all Attorney Specialists do the same job," and "[t]he authorized job title for a given position does not always match the functional job description for that position."  Bryant Aff. ¶ 3.  Henderson categorically denies this is true, Facts ¶ 19, but admits that the position he filled when hired by ADHS in 2010 had a variety of names and responsibilities.  Henderson Dep. 19:19, 34:2, Doc. No. 20-1 (discussing the various names and roles of his job, including "program manager," "area manager," and "training manager").

Henderson's and Walker's statements that APS employees sought legal guidance from the Office of Chief Counsel, which is available to provide legal support to all of ADHS, does not demonstrate that hiring another attorney would not benefit APS; if anything, it supports the assertion that hiring another lawyer would be beneficial.  Henderson states that he does not believe it is possible that Halijan applies her legal knowledge to her responsibilities as division manager, but he also states that it may be possible that Halijan performed legal work and analysis that Henderson simply did not witness.  Henderson Dep. 55:5–18, Doc. No. 20-1.

For all of these reasons, there is no evidence indicating that hiring a lawyer to fill the division manager could not legitimately be viewed as beneficial.

Second, Henderson asserts that he was more qualified than Halijan.  When a more qualified candidate is not hired, a reasonable inference arises that the employment decision was based on something other than the relative qualifications of the applicants.  *Cox*, 792 F.3d at 939.  "To support a finding of pretext, the applicant must show that [the employer] hired a *less* qualified applicant."  *Id.*

Henderson and Halijan offered entirely different types of qualifications.  Henderson had a bachelor's degree in business management and thirty years of managerial experience at United Parcel Service. Henderson Dep. 6:4–8:8, Doc. No. 20-1.  He had six years of managerial experience at DAAS, *Id.* 53:13, and he had filled in for the previous division manager when the previous division manager was out of the office.  Walker Aff. ¶ 25.  Halijan, on the other hand, had a law degree and experience navigating the Arkansas court system and legal community.  ADHS's priorities would therefore determine who was the more qualified applicant.  *Cox*, 792 F.3d at 939, 940 ("[I]t is the employer's role to identify those strengths that constitute the best qualified applicant," and "subjectivity alone does not render an employment decision infirm.").  Accordingly, Henderson has failed to show that he was more qualified than Halijan.

Third, Henderson asserts that ADHS had a culture dominated by race and that its decision to hire a lawyer in the APS division manager position was more than likely motivated by its desire to hire a non-black division manager.  Henderson points out that he is black while Halijan, Brad Nye, Brian Bowen, Craig Cloud, and Lisa McGee are white, and he argues that current management wanted to keep black people out of management.

Henderson Dep. 60:16–61:8, Doc. No. 20-1.  Henderson states he was the first and only black manager at DAAS in 2010.  Henderson Dep. 60:3–5, Doc. No. 20-1.  Henderson's "impression" that management wanted to keep black people out of management was based on the fact that there were no black *male* division managers.   Henderson Dep. 60:16–21, Doc. No. 20-1 (emphasis added).  Doug Walker also testified that "to [his] knowledge, if Mr. Henderson would have been selected as the Division Manager, he would have been the first and only African-American *male* manager working in the [DAAS]," and "Mr. Henderson was the only African-American *male* area manager working for DAAS at the time."  Walker Aff. ¶ 23 (emphasis added).  Accordingly, "the only reason that [Walker] can come up with [for not promoting Henderson to division manager of APS] is due to his race (African-American)."  *Id.* ¶ 24.

Henderson's generalizations are insufficient to show that the hiring of a lawyer for the general manager position was merely pretext for discrimination.  Henderson's case relies on his broad and subjective conclusion that there was no need for a lawyer to be hired as division manager.  *See, e.g.*, Facts ¶ 13.   A plaintiff's own self-serving, conclusory allegations in an affidavit or deposition, are insufficient to defeat summary judgment.  *Haas*, 409 F.3d at 1034.  Taken as a whole, and viewing the facts in the light most favorable to Henderson, there is no evidence giving rise to a reasonable inference that ADHS fabricated the need to hire a lawyer for the division manager position to avoid hiring Henderson because he is black.  *See, e.g.*, *Cox*, 792 F.3d at 938, 941 ("Taken as a whole, Cox does not raise a genuine dispute of material fact that O'Neill's reasons for promoting Doyle are 'unworthy

of credence.'").

The parties have not developed the arguments as to Henderson's sex discrimination claim, but to the extent that Henderson is pursuing that claim, it fails for the same reasons addressed above.

## IV.  CONCLUSION

For these reasons, defendant ADHS's motion for summary judgment [Doc. No. 12] is granted, and this case is dismissed with prejudice.

IT IS SO ORDERED this 13th day of February 2018.

_Brian S. Miller_
UNITED STATES DISTRICT JUDGE